**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| VIA VADIS, LLC and | § | |
| | § | |
| AC TECHNOLOGIES, S.A., | § | |
| | § | Case No. 1:14-cv-813-LY |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| AMAZON.COM, INC., | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFFS' RESPONSE TO AMAZON'S MOTION TO EXCLUDE THE**
**[ALLEGED] IMPROPER REASONABLE ROYALTY ANALYSIS OF PAUL BENOIT**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   LEGAL STANDARDS ........................................................................................ 2

III.  BACKGROUND ................................................................................................. 3

IV.   ARGUMENT ...................................................................................................... 4

    A.    Amazon's Disagreements with the Underlying Documents and Data Relied
        Upon by Mr. Benoit are not the Proper Subject of a *Daubert* Motion ................... 4

        1.    Mr. Benoit's Calculation that 7 Percent of Amazon's S3 Revenue was
            "At Risk" is Based upon a Reliable Method and Supported by the Facts .. 5

        2.    Mr. Benoit's Use of Amazon's Market Share to Support His Conclusions
            is Based upon a Reliable Method and Supported by the Facts ................... 9

    B.    Mr. Benoit's Analysis does not Violate the Entire Market Value Rule ............... 12

    C.    The Analysis Used by Mr. Benoit to Split the Alleged Incremental Profits
        Between the Two Parties is Reliable and Has Not Been Rejected by the Federal
        Circuit ................................................................................................................ 14

    D.    Mr. Benoit's Analysis is Based On a Proper Apportionment and Calculates
        Damages for Only the Patented Features of Amazon's S3 .................................. 18

V.    CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

Cases

*ActiveVideo Networks Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012)...........................................................................5, 9, 10

*Albritton v. Acclarent, Inc.*,
  No. 16-cv-3340, 2019 WL 1379984 (N.D. Tex. Feb. 28, 2020) .............................. 15

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014)..................................................................................3, 19

*Aqua Shield v. Inter Pool Cover Team*,
  774 F.3d 766 (Fed. Cir. 2014)...............................................................................6, 7, 10

*Bd. of Regents, The Univ. of Tex. Sys. v. Ethicon, Inc.*,
  No. 17-cv-1084, 2020 WL 3580148 (W.D. Tex. Apr. 21, 2020) ............................... 5

*Biomedical Enter., Inc. v. Solana Surgical, LLC*,
  No. 14-cv-95, 2016 WL 4198304 (W.D. Tex. Apr. 26, 2016) ....................................11, 14, 19

*Cf. Board or Regents, The Univ. of Tex. Sys.*,
  2020 WL 3580148 (W.D. Tex. April 21, 2020) ........................................................ 10

*Clinicomp Int'l, Inc. v. Athenahealth, Inc.*,
  507 F. Supp. 3d 774 (W.D. Tex. 2020)....................................................................3, 9, 11

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)......................................................................................................... 2

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014)..................................................................................12, 13, 18

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018)..................................................................................13, 18, 20

*Georgia-Pacific Corp. v. U.S. Plywood Corp*,
  318 F. Supp. 1116 (S.D.N.Y. 1970)......................................................................... 17

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010)...................................................................................3, 5, 6, 17

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
  274 F.3d 1371 (Fed. Cir. 2001)................................................................................6, 10

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ......................................................................................... 2

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ..................................................................... 12, 19

*Micro Chem., Inc. v. Lextron, Inc.*,
    317 F.3d 1387 (Fed. Cir. 2003) ....................................................................... 2

*Polaris Powerled Technologies, LLC v. Samsung Electronics America, Inc.*,
    No. 17-cv-00715, 2019 WL 121970 (E.D. Tex. Jan. 7, 2019) ......................... 15

*Realtime Data LLC v. EchoStar Corp.*,
    No. 17-cv-00084, 2018 WL 6266301 (E.D. Tex. Nov. 15, 2018) ..................... 14

*Salazar v. HTC Corp.*, No. 16-cv-01096,
    2018 WL 1783157 (E.D. Tex. Apr. 13, 2018) ................................................. 14

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015) ....................................................... 2, 4, 15, 17

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ..................................................................... 12

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ............................................................... 15, 17

## I.    INTRODUCTION

Plaintiffs Via Vadis, LLC and AC Technologies, S.A. (collectively "Plaintiffs") respectfully submit this response to Defendant Amazon.com, Inc.'s ("Amazon") motion to exclude some or all of the opinions of Plaintiffs' damages expert Paul Benoit.  *See* Dkt. 197.

Amazon's motion raises four putative issues in its effort to exclude the testimony of Plaintiffs' damages expert, each of which should be denied because:  (1) Mr. Benoit's calculations are based on underlying facts and data and are sufficiently tied to the facts of the case; (2) Mr. Benoit's analysis does not implicate, much less violate, the entire market value rule: (3) Mr. Benoit does not use the Nash Bargaining Solution; and (4) Mr. Benoit appropriately apportions Amazon's S3 revenues to only those features that are covered by the patent-in-suit, the '521 Patent.

Amazon's first argument is, at its core, a dispute with the documents, data, and deposition testimony that Mr. Benoit relies upon for his analysis.  As discussed in Section IV.A., below, this is not the proper subject matter of a *Daubert* motion.

Amazon's remaining arguments are based on a mischaracterization of the methodology employed by Mr. Benoit.  Contrary to Amazon's arguments, Mr. Benoit's analysis properly apportions damages to only the patented feature—the BitTorrent feature—of Amazon's S3.  As discussed in Sections IV.B and D, below, neither the royalty base nor royalty rate is based on the entirety of S3's revenues in Mr. Benoit's reasonable royalty analysis.

Amazon's argument that Mr. Benoit improperly applied the arbitrary 50/50 split from the Nash Bargaining Solution, which has been rejected by the Federal Circuit, is also incorrect.  As discussed in Section IV.C., there is nothing arbitrary about Mr. Benoit's analysis, which ties the split of incremental profits to the particular facts of this case using a methodology already approved

by the Federal Circuit. For these reasons, and as discussed below, Amazon's motion should be denied.

## II.    LEGAL STANDARDS

The admissibility of expert evidence is governed by Federal Rules of Evidence 702 and 703, as interpreted by the Supreme Court in, *e.g.*, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). In patent cases, the admissibility of expert testimony under Rule 702 is governed by the law of the regional circuit. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003).

Rule 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 703 states:

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Thus, under these Rules, the district court acts as a gatekeeper of the admissibility of that evidence, excluding it where it "is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1285 (Fed. Cir. 2015); *see also Apple*

*Inc. v. Motorola, Inc.,* 757 F.3d 1286, 1314 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC,* 792 F.3d 1339 (Fed. Cir. 2015).

"*Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness," and when the methodology "is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852, 854 (Fed. Cir. 2010); *Clinicomp Int'l, Inc. v. Athenahealth, Inc.*, 507 F. Supp. 3d 774, 779 (W.D. Tex. 2020) ("Any questions related to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration. CliniComp may explore these issues by cross-examination."). Indeed, "[q]uestions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury." *Id.* at 856. The Federal Circuit has also recognized that "any reasonable royalty analysis necessarily involves an element of approximation, and uncertainty." *Id.* at 857-58.

## III.    BACKGROUND

There is no dispute that BitTorrent is the feature of Amazon's S3 accused of infringing the '521 Patent. Dkt. 197 at 1. It is a type of Peer-to-Peer ("P2P") program that allows users to share files between computers rather than between a computer and the server. Ex. A (Benoit Report at ¶¶13, 17-21). At the time of S3's launch, BitTorrent was an extremely popular P2P program, offering many benefits over traditional computer/server architecture such lower bandwidth use in file transfers (thereby increasing download speeds) and resulting in cost-savings. *Id.* at ¶¶22-25.

Amazon launched S3 in 2006, which offered cloud storage with file distribution technology, including the use of BitTorrent for file distribution. *Id.* at ¶30. The cloud storage

market quickly became competitive with intense price-competition—indeed, Amazon has reduced its price more than 30 times since S3 launched. *Id.* at ¶¶31-32. Given the importance of price in this market, Amazon's marketing materials were specifically targeted to its various customer segments, and its marketing materials for software developers specifically highlighted S3's BitTorrent features, urging that use of BitTorrent by software developers—where content is distributed at a high scale—results in an effective cost-savings by lowering transfer costs. *Id.* at ¶¶35-43. Amazon was able to distinguish itself from other competitors on this basis because it was the only cloud services provider using BitTorrent. *Id.* at ¶43.

Using this background information and his considerable experience and qualifications as a damages expert, Mr. Benoit constructed a lump-sum reasonable royalty, which Amazon testified was its preferred approach on the date of the hypothetical negotiation. *Id.* at ¶¶3, 55, Exhibit A. In accordance with Federal Circuit precedence, Mr. Benoit then apportioned the S3 revenues attributable to the BitTorrent feature. His methodology is based on a hypothetical negotiation framework at the time of S3's launch, with careful consideration of each *Georgia-Pacific* factor, including the consideration of other licenses and their rates, Amazon's expected incremental profit margin related to the accused feature, and the parties' bargaining positions.

## IV.    ARGUMENT

### A.    Amazon's Disagreements with the Underlying Documents and Data Relied Upon by Mr. Benoit are not the Proper Subject of a *Daubert* Motion

Here, Amazon does not challenge Mr. Benoit's qualifications, principles, or methods. Indeed, they could not do so as he has been qualified as a damages expert numerous times, and his analysis uses a hypothetical negotiation, working through each of the relevant *Georgia-Pacific* factors to estimate a reasonable royalty, which has consistently been held to be a reliable method by the Federal Circuit. *See Summit 6, LLC*, 802 F.3d at 1298 (finding Mr. Benoit's methodology

"structurally sound and tied to the facts of the case"); *i4i Ltd. P'ship*, 598 F.3d at 854 (noting that a hypothetical negotiation under the *Georgia-Pacific* factors has been "consistently upheld").

Instead, Amazon asserts that Mr. Benoit lacks data and factual support for two calculations: (1) his calculation that 7% of Amazon's S3 revenue was "at risk"; and (2) his calculation of how much of this "at risk" revenue would have been lost absent Amazon's infringement. Dkt. 197 at 9-11. This is incorrect. As demonstrated below, Mr. Benoit's calculations are supported by numerous documents, including Amazon's internal documents, and testimony of its witnesses.

At their core, Amazon's challenges are really disagreements with Mr. Benoit's conclusions and the considerations underlying those conclusions. Because such disagreements go to the weight to be afforded to Mr. Benoit's testimony, and not its admissibility, Amazon's motion should be denied. *See ActiveVideo Networks Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012); *Clinicomp Int'l*, 507 F. Supp. 3d at 779.

### 1. *Mr. Benoit's Calculation that 7 Percent of Amazon's S3 Revenue was "At Risk" is Based upon a Reliable Method and Supported by the Facts*

Amazon argues that Mr. Benoit's 7% calculation should be excluded because it is not based upon the facts and data that Amazon proposes it should be based upon. Dkt. 192 at 9-10. Specifically, Amazon faults Mr. Benoit for not relying on surveys or actual usage data of BitTorrent (despite the fact that no evidence of such exists near the time of the hypothetical negotiation), *id.*, but this is not proper subject matter for a *Daubert* motion. *Bd. of Regents, The Univ. of Tex. Sys. v. Ethicon, Inc.*, No. 17-cv-1084, 2020 WL 3580148, at *4 (W.D. Tex. Apr. 21, 2020) ("Alternative or opposing facts, data, and assumptions do not preclude admission of expert testimony, that is, they go to the weight of the evidence, not admissibility.").

Additionally, it is Amazon's insistence on reference to events after the agreed date of the hypothetical negotiation that violates the general approach established by the relevant cases. In

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*, the Federal Circuit affirmed a jury's reasonable royalty award on a projected business plan from the time of the first infringement, despite evidence later showing that the actual sales did not meet those projections. 274 F.3d 1371, 1384 (Fed. Cir. 2001). The court noted that "the negotiation must be hypothesized as of the time infringement began…," the "fact that Infinite did not subsequently meet those projections is irrelevant to Infinite's state of mind at the time of the hypothetical negotiation…," "Infinite's failure to meet its projections may simply illustrate the 'element of approximation and uncertainty' inherent in future projections…," and if it had required sales projections to bear a close relation to actual sales revenue, it "would essentially eviscerate the rule that recognizes sales expectations at the time when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of actual sales…" *Id.*

Similarly, in *Aqua Shield v. Inter Pool Cover Team*, the Federal Circuit vacated the District Court's royalty determination because it treated the infringer's actual profits as a royalty cap. 774 F.3d 766, 772 (Fed. Cir. 2014). The Federal Circuit also noted that post-infringement profits "may be relevant, but only in an indirect and limited way—as some evidence bearing on a directly relevant inquiry into anticipated profits…" and that "the core economic question is what the infringer…would have anticipated the profit-making potential of the patented technology to be, compared to using non-infringing alternatives…" *Id.* at 770. The Court also cautioned against replacing the forward-looking hypothetical inquiry into what the parties would have anticipated with a backward-looking inquiry into what turned out to have happened. *Id.* at 772.

These are textbook disputes about the degree of relevancy of such facts, which are not proper subjects for a *Daubert* motion. *See i4i Ltd. P'ship*, 598 F.3d at 852. Moreover, contrary to Amazon's assertions, the Federal Circuit has explained that what actually occurred is of limited

and indirect relevance to a damages analysis under the hypothetical negotiation where "the core economic question is what the infringer, in a hypothetical pre-infringement negotiation under hypothetical conditions, would have *anticipated* the profit-making potential of use of the patented technology to be, compared to using non-infringing alternatives." *Aqua Shield*, 774 F.3d at 770 (emphasis in original).

Mr. Benoit's conclusion that 7 percent of Amazon's S3 revenue was exposed to the patent-in-suit or "at risk" is instead properly based on documents evidencing the expectations for BitTorrent (the infringing feature of Amazon's S3) <u>at the time of the hypothetical negotiation</u> including:

- Documents evidencing BitTorrent's popularity around the time Amazon's S3 was launched (Ex. A at ¶¶22-25);

- Documents evidencing the popularity of Amazon's S3 BitTorrent feature (*Id.* at ¶¶33, 37, 41);

- Documents evidencing the benefits of BitTorrent compared to traditional client/server architecture, particularly with respect to its improvements in download speed and ability to use less bandwidth for file sharing, which in turn, results in customer cost-savings (*Id.* at ¶¶21-25, 39-40, 42-43);

- Documents evidencing that the cloud storage services market was intensely price competitive and the importance of price in customers' decisions regarding which cloud service to purchase (*Id.* at ¶¶31-32, 42-43);

- Documents evidencing that Amazon's S3 was targeted specifically to software developers (*Id.* at ¶¶36-38);

- Documents and deposition testimony evidencing that Amazon highlighted BitTorrent in its marketing materials to software developers (*Id.* at ¶39);

- Documents evidencing that Amazon specifically marketed the cost-savings potential of BitTorrent to software development companies (*Id.*, quoting the Amazon BitTorrent user guide's statement that "<u>Amazon S3 supports the</u> <u>BitTorrent protocol so that developers can save costs when distributing content at</u> <u>high scale</u>.") (emphasis added)); and

- Documents evidencing that 7 percent of Amazon's S3 customers are software companies (*Id.* at ¶¶36, 43).

Mr. Benoit relies on dozens of documents (both internal Amazon documents and third party research materials) and deposition transcripts in the foregoing categories to reach his conclusion that Amazon would have targeted software companies with S3's BitTorrent implementation, there was demand for the BitTorrent feature among this group of Amazon S3 customers due to their price sensitivities, and thus these are the companies that would have been "at risk" but for Amazon's use of the patent-in-suit. *Id.* at ¶43.[1]  Although it tries to

---

[1] Amazon's argument that Mr. Benoit's logic is allegedly flawed is irrelevant to its *Daubert* motion, and also misses the point. Dkt. 197 at 10. *First*, as discussed above, Mr. Benoit's analysis focuses on a subgroup of customers that prioritized BitTorrent and that Amazon targeted specifically with the BitTorrent protocol. *Second*, while software developers may have utilized the direct download features of S3, competitors of Amazon have those same direct download features. BitTorrent allowed Amazon to offer a service to software developers that was cheaper than its competition in an intensely price competitive market. *See* Ex. A at ¶¶42-43; Ex. B, Benoit Dep. Tr. at 86:15-87:7. As Mr. Benoit explained, without the BitTorrent feature, such software developers would not prefer Amazon over any of its competitors as price would be consistent between competitors. *Id.  Finally*, as discussed below, Mr. Benoit further accounts for other features and functionalities related to S3 by allocating 43.1% to such features and functions.

diminish the relevancy of some of these materials, Amazon even acknowledges, as it must, that Mr. Benoit's conclusion is based on underlying documents.  Dkt. 197 at 10.[2]

Amazon then arrives at the crux of its argument:

> From that, he summarily concludes that 7% of Amazon's S3 revenue would have been at risk if Amazon did not offer a BitTorrent interface.  . . . In reaching this conclusion, Mr. Benoit makes the illogical leap that because a feature was marketed to potential software developer customers, the revenue from those customers was at risk if that feature was not included, without any evidence of what percentage of customers actually wanted that feature.

Dkt. 197 at 10 (emphasis added).  This challenge to Mr. Benoit's conclusions and the "factual assumptions and considerations underlying those conclusions" is precisely the type of challenge precluded by *Daubert*.  *ActiveVideo Networks Inc.*, 694 F.3d at 1333.  To the extent Amazon has a quarrel with the facts upon which Mr. Benoit relies and alleges that there are weaknesses in his assessment of the demand for the BitTorrent feature among software companies based on those facts, these disagreements go to the "weight to be afforded to his testimony and not its admissibility."  *Id.*; *Clinicomp Int'l, Inc.*, 507 F. Supp. 3d at 779.  Amazon's motion should be denied because there is no dispute that Mr. Benoit used a reliable method in his damages analysis, and his 7% "at risk" calculation is supported by facts and data.

**2.    *Mr. Benoit's Use of Amazon's Market Share to Support His Conclusions is Based upon a Reliable Method and Supported by the Facts***

Amazon's dispute regarding Mr. Benoit's use of Amazon's market share largely tracks its first argument, *i.e.*, Amazon argues that Mr. Benoit should have relied on different documents,

---

[2] While Amazon criticizes the source of some documents (Dkt. 197 at 10), it has not produced any documents contradicting, e.g., that 7% of S3 users are software companies.  In any event, such arguments go to the weight that should be afforded to Mr. Benoit's testimony and not its admissibility.  *Clinicomp Int'l*, 507 F. Supp. 3d at 779.

primarily surveys and the actual usage of BitTorrent.  Dkt. 197 at 11.  *Cf. Board or Regents, The Univ. of Tex. Sys.*, 2020 WL 3580148, at \*4.

Mr. Benoit used Amazon's market share to further apportion the "at risk" software developer S3 revenue to only those revenues attributable to BitTorrent.  Amazon argues that use of market share data is improper when actual usage is available.[3]  *See* Dkt. 197 at 11.  Inevitably, this is a dispute amongst the experts as to the weight that should be given to evidence, not admissibility, argument.  Moreover, as explained above, actual usage data is, at most, only marginally relevant to the hypothetical negotiation analysis, which takes place before the infringement occurs and is based on the parties' expectations.  *See Aqua Shield*, 774 F.3d at 770; *Interactive Pictures*, 274 F.3d at 1384.  Viewed in context, Mr. Benoit's reliance on Amazon's market share is supported by the underlying documents and more appropriate under the case law.

Mr. Benoit cited numerous documents evidencing that customers used the price of cloud storage services as their "primary decision criteria." Ex. A at ¶¶31-32, 42.  In fact, his report reflects evidence that Amazon sought to capitalize on such economic realities to attract new customers, particularly software developers, highlighting that BitTorrent could reduce the effective price paid by its customers.[4]  *Id.* at 35-42.  Based on this evidence demonstrating that price impacts software developers' selection of service providers, Mr. Benoit next sought to

---

[3] Notably, Amazon only produced BitTorrent usage data from October 2010 – March 2021, at least 4.5 years after the hypothetical negotiation date, and subsequent to Amazon's error plagued implementation of the BitTorrent feature.  *See* Ex. C (AMZ-VIA-VADIS-0000008-0009).  Thus, this usage data bears no resemblance to Amazon's expectations at the April 2006 launch date.

[4] Amazon argues that because "one blogger liked the feature [and called it a killer app, it] does not show that any of Amazon's customers believed the same. Dkt. 197 at 13. Amazon fails to recognize that Amazon and Jeff Barr (Chief Evangelist for AWS) sponsored the article by referring potential customers to it in Jeff Barr's own blog posts relating to AWS S3.  Ex. A at ¶¶41-42.  In any event, Amazon's arguments regarding the alleged shortcomings of this document goes to its weight, and not admissibility.  *ActiveVideo Networks*, 694 F.3d at 1333.

determine the relative success that Amazon would have had in obtaining such customers if it had

not offered the BitTorrent feature to reduce the effective price of the service. *Id.* at ¶¶44, 102-103.

That is, he further apportioned the "at risk" software developer revenues to determine how much

of that revenue Amazon was likely to retain in the event that it did not have the ability to use

BitTorrent to reduce the effective price paid by S3 customers and, conversely, lose by not offering

the patented feature, relying on Amazon's market share as a proxy to quantify its unique

contributions to the cloud service offering relative to those of its competitors. *Id.*

Thus, based on Amazon's market share,[5] Mr. Benoit conservatively allocated a total of

43.1% of estimated software developer S3 revenue to Amazon S3's non-patented features and

functionalities, the Amazon brand, and other non-patent related contributions made by Amazon to

S3, with the remainder apportioned to the patented feature (BitTorrent) that was not offered by

any other cloud service provider (~4% of Amazon's S3 US revenues). Ex. A at ¶44, Exhibit E; Ex.

B at 54:7-16.

Viewed in the proper context provided by the underlying documents, it is plain that Mr.

Benoit gave careful consideration, providing his reasoning in his report and deposition, for using

Amazon's market share as a proxy for the percentage of "at risk" revenue Amazon would have

retained without offering the infringing BitTorrent feature. He accounted for Amazon's

contributions other than the BitTorrent feature, and properly did not include those revenues in his

---

[5] As with the underlying documents used to determine the 7% "at risk" revenue, Amazon again criticizes the source of the documents used to determine Amazon's market share (Dkt. 197 at 7), when it has not produced any contradictory documents. Again, even if it did, such arguments go to the weight that should be afforded to Mr. Benoit's testimony and not its admissibility. *Clinicomp Int'l*, 507 F. Supp. 3d at 779; *see also Biomedical Enter., Inc. v. Solana Surgical, LLC*, No. 14-cv-95, 2016 WL 4198304, at *3 (W.D. Tex. Apr. 26, 2016) (finding that disagreements regarding the alleged shortcomings of third party market share <u>data relied upon by Amazon's expert in this case</u>, Ms. Kindler, for her opinion in a previous case, go to the weight, rather than admissibility, of the opinion).

damages analysis.  This is all that is required by the case law, *see Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014), and Amazon's motion should be denied.

### B.    Mr. Benoit's Analysis does not Violate the Entire Market Value Rule

The Federal Circuit has explained that "the patentee ... must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented features and the unpatented features ... or show that the entire market value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).  The latter is referred to as the "Entire Market Value Rule," and applies where "it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).

Relying on *VirnetX*, Amazon argues that Mr. Benoit's analysis must be limited to revenue generated from data transmitted via BitTorrent and any revenue attributed in excess of such revenue violates the entire market value rule t.  Dkt. 197 at 13.  To the contrary, Mr. Benoit has articulated evidence reflecting the importance of price as a driver of sales of S3 services, Ex. A at ¶¶31-33, 40, and thus the economic footprint of the invention would not only reflect revenue generated from data transmitted via BitTorrent, but also the ability to attract customers to Amazon's S3 by reducing the effective price of the service.  Amazon's seeks to inappropriately exclude this evidence, which should be considered by the jury.

Further, Amazon misrepresents Mr. Benoit's analysis, which appropriately apportions the revenues attributable to BitTorrent.  *Id.* at ¶¶43-44, 102-103.  The Federal Circuit has recognized that there are a variety of ways to address apportionment, including "by careful selection of the royalty base to reflect the value added by the patented feature [or] ... by adjustment of the royalty

12

rate so as to discount the value of a product's non-patented features; or by a combination thereof." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018). "The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Ericsson, Inc.*, 773 F.3d at 1226. A review of Mr. Benoit's analysis demonstrates that this is exactly what he did, and neither his royalty rate nor royalty base is based on the entire revenue of Amazon's S3.

Mr. Benoit first apportioned the Amazon S3 revenues to only those that were "at risk" without BitTorrent. He explains that, based on conversations with Plaintiffs' technical expert, Mr. Zeidman, his understanding is that BitTorrent is the feature of S3 that uses the '521 Patent. Ex. A at ¶¶12, 34; Ex. B at 125:22 – 126:10. As discussed above, he then determined the customer segment (software developers) for which there was demand for BitTorrent—the segment of S3 revenue that was "at risk" without it—and calculated this to be 7% of the S3 customer base. Ex. A at ¶¶43-44, 102-103. This percentage—7%—is applied to the total US S3 revenue to calculate the portion of S3 revenue "at risk" should BitTorrent not be included. *Id.* As Mr. Benoit explained, his analysis is conservative as it does not allocate any of the remaining 93% of S3 revenue as being "at risk" even though it is possible that other customers may not have purchased S3 without BitTorrent. Ex. B at 183:19 – 184:2. Thus, this entire 93% of S3 revenue is apportioned to non-patented features.

The second step of Mr. Benoit's analysis was to further apportion the "at risk" revenue based on a recognition that Amazon likely would not have lost all of the "at risk" revenue, and apportioning the "at risk" revenue based on Amazon S3's average market share. Ex. A at ¶¶44, 102-103. Mr. Benoit estimated that average market share (43.1%) and apportioned that percentage of the "at risk" revenue to non-patented features—i.e., his analysis conservatively estimates that

13

Amazon would have retained those software developer customers even without the BitTorrent feature. *Id.*   Thus, only the remaining 56.9% of the 7% "at risk" S3 revenue was apportioned to the BitTorrent feature covered by the '521 Patent. *Id.*

The final steps of Mr. Benoit's analysis were to determine the expected profitability of the apportioned revenue and derive a royalty based on a hypothetical negotiation under the *Georgia-Pacific* factors, including (as discussed in Section IV.C. below) any splitting between Plaintiffs and Amazon of the expected incremental profits attributable to the patented features. *Id.* at ¶¶114-126 (setting forth his conclusions after addressing each *Georgia-Pacific* factor).

As the foregoing demonstrates, contrary to Amazon's argument, Mr. Benoit does not rely on the total revenues of S3 to determine the royalty rate or calculate his royalty base.  Thus, the entire market value rule is not implicated by his analysis, and Amazon's motion should be denied.

### C.    The Analysis Used by Mr. Benoit to Split the Incremental Profits Between the Two Parties is Reliable and Has Not Been Rejected by the Federal Circuit

Amazon argues that Mr. Benoit methodology is a "rule of thumb," "no more than ipse dixit," and is similar to that of the expert in *VirnetX*, which was rejected by the Federal Circuit. Dkt. 197 at 14-16.  This is incorrect.  There are many distinctions between the methodology used by Mr. Benoit and that used in *VirnetX*, and Mr. Benoit's methodology has been routinely upheld as appropriate.  *See, e.g.*, *Biomedical Enter., Inc.*, 2016 WL 4198304, at *6 (allowing Amazon's expert in this case, Ms. Kindler, to testify in another case where "Kindler's 50/50 opinion is sufficiently tied to the facts in this case and is not an arbitrary decision."); *Realtime Data LLC v. EchoStar Corp.*, No. 17-cv-00084, 2018 WL 6266301, at *11 (E.D. Tex. Nov. 15, 2018) (allowing expert testimony about a 50/50 profit split because the expert "consider[ed] specific facts of the case and the respective Parties' bargaining positions"); *Salazar v. HTC Corp.*, No. 16-cv-01096, 2018 WL 1783157, at *2 (E.D. Tex. Apr. 13, 2018) (same).  Indeed, Mr. Benoit has used this same

14

methodology in numerous patent cases and, although repeatedly challenged, it has never been excluded by any court. *See, e.g.*, *Albritton v. Acclarent, Inc.*, 16-cv-3340, slip op. at 41 (N.D. Tex. Feb. 28, 2020) (finding "exclusion unwarranted" where Mr. Benoit's incremental profit splitting was premised "on the specific facts of the case"); *Polaris Powerled Technologies, LLC v. Samsung Electronics America, Inc.*, 17-cv-00715, slip op. at 2 (E.D. Tex. June 7, 2019) (denying motion to exclude Mr. Benoit's opinions, including his split of the incremental profits).

One crucial distinction is that the *VirnetX* expert did not consider the specific facts of the case and ignored the strengths and weaknesses of each party's negotiation position; instead, he considered <u>only</u> the incremental profit at issue, split the incremental profit 50/50, and then compounded the error by arbitrarily modifying the split to 45/55, <u>without performing a quantitative analysis or identifying supporting facts</u> for the adjustment. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332-33 (Fed. Cir. 2014). The Federal Circuit found that this was error because the analysis was not tied to the facts of the case.

Mr. Benoit, on the other hand, utilized the same methodology in the present matter that he did in *Summit 6*, which the Federal Circuit confirmed was a "structurally sound" methodology. *See Summit 6*, 802 F.3d at 1297. As in *Summit 6*, Mr. Benoit utilized the *Georgia-Pacific* ("GP") factors to analyze the potential benefits that Amazon was expected to enjoy from use of the Patent-in-Suit.[6] The GP Factors guided Mr. Benoit's quantification of the expected benefits to Amazon from its use of the Patent-in-Suit, and Mr. Benoit articulated the conditions strengthening and weakening each party's negotiating position. *See, e.g.*, Ex. A at ¶¶114-126, setting forth his conclusions after addressing each *Georgia-Pacific* factor in the preceding 26 pages. Specifically,

---

[6] Amazon argues that *Summit 6* is distinguishable because Mr. Benoit relied on survey evidence in that matter. As explained above, Mr. Benoit's methodology is sound, and disputes about alleged weaknesses in the underlying data relied upon are not proper subjects for a *Daubert* motion.

Mr. Benoit considered, as he has in other cases, the following circumstances:

- The need for the licensor to achieve recognition and credibility for the subject technology within the industry;

- The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly;

- The commercial relationship between the licensor and the licensee, and the anticipated impact that the license may have on the licensor's profits;

- The risk of utilizing its assets in the commercialization of the patented technology; and

- The risk of incurring significant implementation costs associated with use of the patented technology which may not be recovered.

*Id.* at ¶¶120, 124.

Mr. Benoit clearly articulated his conclusions regarding each of these circumstances based on the evidence in this case. *Id.* at ¶¶117-126. He then quantified the amount each party to the negotiation would require to compensate for the difference in negotiating position. *Id.* By quantifying and removing such amounts from the anticipated incremental profit, Mr. Benoit placed the parties in an equal bargaining position for the amount of profit that <u>remained</u> the subject of the negotiation. It is only at this point, after all differences in negotiating position between the parties have been accounted for, that Mr. Benoit contemplated that the parties would share such remaining incremental profit evenly based on their equal bargaining positions. *Id.* at ¶126; Ex. B at 122:9 – 123:2, 132:1-22. Thus, Mr. Benoit split incremental profits 52.23%/47.77% in favor of Amazon. *See* Dkt. 197 at 15.

Thus, contrary to Amazon's argument, Mr. Benoit did <u>not</u> apply a "rule of thumb" like the one rejected in *VirnetX*. 767 F.3d at 1332-33. Instead, he clearly identified the conditions that would impact the negotiation, as well as the way in which such conditions would impact the negotiation. This is the precise methodology of facilitating the hypothetical negotiation construct endorsed by the Federal Circuit, which stated the following regarding Mr. Benoit's profit splitting analysis: "Mr. Benoit then envisioned a hypothetical negotiation in which the parties would have bargained for respective shares of the economic benefit, given their respective bargaining positions and alternatives to a negotiated agreement. Mr. Benoit's methodology was structurally sound and tied to the facts of the case." *Summit 6, LLC*, 802 F.3d at 1298.

To the extent Amazon argues that additional strengths and weaknesses should have been considered (Dkt. 197 at 16), that is a question for the jury. *i4i Ltd. P'ship*, 598 F.3d at 856. Likewise, Amazon's argument that Mr. Benoit has not cited to any evidence that Plaintiffs or Amazon have ever employed a technique similar to Mr. Benoit's methodology in determining a patent license rate is irrelevant for *Daubert* purposes. The absence of evidence of such considerations by the parties in prior negotiations does not equate to the absence of the parties' use of such considerations in the hypothetical negotiation, which has many distinctions from a real-world negotiation, particularly that the "facts which, like cards dealt face up, are for all to see." *Georgia-Pacific Corp. v. U.S. Plywood Corp*, 318 F. Supp. 1116, 1122 (S.D.N.Y. 1970). As such, both parties in a hypothetical negotiation have full knowledge of the relevant facts and circumstances whereas that is not the case in real-world negotiations. Thus, the lack of evidence of such considerations in prior licenses does not render the methodology unsound. In any event, it would at most go to the weight that should be accorded to Mr. Benoit's testimony, and is not properly the subject of a *Daubert* motion.

### D.    Mr. Benoit's Analysis is Based On a Proper Apportionment and Calculates Damages for Only the Patented Features of Amazon's S3

The parties do not dispute that apportionment of Amazon's S3 revenues is required in this case.  However, as stated numerous times through his report, Mr. Benoit's analysis is properly limited to the incremental value of Amazon's use of the '521 Patent.  Ex. A at ¶¶34, 43-44, 95, 100, 102-104.

The Federal Circuit has recognized that there are a variety of ways to address apportionment, including "by careful selection of the royalty base to reflect the value added by the patented feature [or] ... by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018)(citing *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)).  "The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Ericsson, Inc.*, 773 F.3d at 1226.

As discussed in section IV.B., above, Mr. Benoit properly apportioned the value of BitTorrent from the other features of Amazon's S3.  Amazon now argues that Mr. Benoit should have further apportioned BitTorrent into patented and non-patented features because "it cannot be genuinely disputed" that BitTorrent contains features not disclosed in the patent.  Dkt. 197 at 18.

Contrary to Amazon's statement, however, whether BitTorrent contains features that are not covered by the '521 Patent is a hotly disputed fact.  During his deposition, Mr. Benoit explained that it was his understanding, based on discussions with Plaintiffs' technical expert, Mr. Zeidman, that there are not features of BitTorrent that are not covered by the '521 Patent.  Ex. B at 123:5-23.  It is acceptable, and indeed necessary, for a damages expert to rely on the opinions of a technical expert regarding such technical aspects of the case.  *Apple Inc.*, 757 F.3d at 1321

("Consistent with Rule 703, patent damages experts often rely on technical expertise outside of their field when evaluating design around options or valuing the importance of the specific, infringing features in a complex device.").

However, Mr. Benoit also explains that even if there were some minor, non-patented features of BitTorrent, it is the patented features that drove the demand for BitTorrent. Ex. B at 123:5 – 126:10, 128:12 – 131:23. In such cases, it is appropriate to attribute the entire value of BitTorrent[7] to the '521 Patent. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51,67 (Fed. Cir. 2012). In any event, such disputes are not appropriately resolved at the *Daubert* stage. *Biomedical Enter., Inc.*, 2016 WL 4198304, at *5-6 (denying *Daubert* motion filed against Amazon's damages expert for this case, Ms. Kindler, and explaining that "disagreements" as to the apportionment and use of the entire market value of the accused product by Kindler "goes to the evidentiary weight rather than the admissibility of her opinion).

Mr. Benoit further explained that after receiving the reports of Amazon's technical and damages experts, which apportion BitTorrent into eight features (only some of which they allege are covered by the '521 Patent), he had a further conversation with Mr. Zeidman to confirm his understanding that the entire value of BitTorrent is attributable to the '521 Patent. Ex. B at 123:9-14. Mr. Zeidman confirmed Mr. Benoit's understanding, explaining that as a technical matter, "the '521 patent reads on all of these eight factors, they're part of the '521 patent's asserted claims in this case." *Id.* at 123:20-23. Thus, even considering the apportionment of the BitTorrent

---

[7] To be clear, this argument only addresses the entire value of the BitTorrent feature, and does not attempt to capture S3's total revenues.

features identified by Amazon's experts, there is no need to apportion BitTorrent's value based on these features because each is covered by the '521 Patent.  *Id.*[8]

Amazon's recital of a laundry list of features allegedly not covered by the '521 Patent (Dkt. 197 at 18) underscores the inapplicability of *Daubert* to the challenge presented by Amazon's motion.   *Daubert* motions properly apply only to the qualifications of an expert and the methodology or reasoning used to render an expert opinion. They are not properly used to resolve factual disputes like the ones raised in Amazon's brief.  Because Mr. Benoit's analysis properly addresses only the incremental value of Amazon's use of the '521 Patent, and Amazon's remaining criticisms go to the weight of the evidence, which is irrelevant to the admissibility of Mr. Benoit's opinion, Amazon's motion should be denied.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Amazon's *Daubert* Motion to Exclude the Analysis of Paul Benoit.

---

[8] This argument is distinguishable from the one rejected in *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018). In *Exmark*, the asserted claim was directed to a lawn mower as a whole, and the patent owner argued that apportionment of the infringing baffles feature was thus not required as the claim covered the entire lawn mower.  *Id.* The Federal Circuit disagreed, explaining that apportionment was still required to ensure damages were only awarded on the patented improvement and not the conventional components. *Id.*  Here, as discussed in Section IV.B., Plaintiffs do not seek damages on the entire revenues for the Accused Product—Amazon's S3.  Instead, Mr. Benoit apportioned those revenues to only the feature covered by the '521 Patent—the BitTorrent feature.

Dated:  October 1, 2021                          Respectfully submitted,

                            By:      */s/ Gabriel R. Gervey*
                                     Andrew G. DiNovo
                                     Texas State Bar No. 00790594
                                     Gabriel R. Gervey
                                     Texas State Bar No. 24072112
                                     Adam G. Price
                                     Texas State Bar No. 24027750
                                     Daniel L. Schmid
                                     Texas State Bar No. 24093118
                                     Gregory S. Donahue
                                     Texas State Bar No. 24012539
                                     DINOVO PRICE LLP
                                     7000 N. MoPac Expressway, Suite 350
                                     Austin, Texas 78731
                                     Telephone: (512) 539-2626
                                     Facsimile:  (512) 539-2627
                                     adinovo@dinovoprice.com
                                     ggervey@dinovoprice.com
                                     aprice@dinovoprice.com
                                     dschmid@dinovoprice.com
                                     gdonahue@dinovoprice.com

                                     Robert J. Weltchek
                                     Weltchek Mallahan & Weltchek
                                     2330 West Joppa Road, Suite 203
                                     Luterville, Maryland 21093
                                     (410) 825-5287
                                     rweltchek@wmwlawfirm.com

                                     **ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically on this the 1st of October, 2021. As such, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system. All other counsel of record not deemed to have consented to electronic service have been served by email.

<u>*/s/ Gabriel R. Gervey*</u>
Gabriel R. Gervey